UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
                                                     :

PAUL J. MURPHY, Acting Regional Director of   :
the Third Region of the National Labor Relations   :
Board, for and on behalf of the   :
NATIONAL LABOR RELATIONS BOARD,   :
                                                     :

                         Petitioner,   :          14-cv-8570 (NSR)
    -against-   :          OPINION & ORDER
                                                     :

ALLWAYS EAST TRANSPORTATION, INC.,   :

                        Respondent.   :
---------------------------------------------------------------- X

NELSON S. ROMÁN, United States District Judge

      Paul J. Murphy (the "Regional Director" or "Petitioner"), Acting Regional Director for

the Third Region of the National Labor Relations Board (the "Board") petitions this Court for

temporary injunctive relief pursuant to § 10(j) of the National Labor Relations Act (the "Act").

29 U.S.C. § 160(j).  For the following reasons, the Regional Director's petition is DENIED.

## BACKGROUND

      In February 2014, Respondent Allways East Transportation, Inc. contracted with

Dutchess County, New York to transport preschool and special education students formerly

transported by nonparty Durham School Services ("Durham").  (Pet. at 4, ECF No. 1.)  Durham

is a national bus company whose bus drivers and matrons[1] are represented by the International

Brotherhood of Teamsters, Local 445 (the "Union").[2]  (Pet'r's Mem. at 5, ECF No. 3.)

---

[1] Respondent uses the word "matrons" to describe employees who supervise students on a bus.  Durham uses the word "monitors."

[2] After a Board election, the Union was certified on October 28, 2009 as the bargaining representative of all drivers and monitors in Durham's facilities in Red Hook, New York, and Poughkeepsie, New York.  The applicable collective-bargaining agreement expires in August 2018.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/1/2014

Respondent is a small bus company specializing in preschool and special education transportation, which has never had union employees.  (Pet. Ex. C. at 1-2, ECF No. 1.)

To handle the new routes, Respondent began hiring bus drivers and matrons, many of whom previously worked for Durham.  (Pet'r's Mem. at 6, ECF No. 3.)  Respondent also opened a new terminal in Wappingers Falls, New York for the Dutchess County routes.[3]  (Id. at 7.)  By April 22, 2014, the date on which Respondent began servicing the Dutchess County routes, Respondent had hired roughly 60[4] former Durham employees and assigned them to the new facility in Wappingers Falls.  (Id. at 6.)  As of that date, former Durham employees made up a majority of the drivers and matrons at Wappingers Falls.[5]  (Id.)  Excluding Wappingers Falls, Respondent also employs approximately 200 additional drivers and matrons based out of Durham's main facility in Yonkers, New York.  (Id. at 7.)

No card check or Board election has been conducted since Respondent contracted with Dutchess County.  On March 10, 2014, the Union called and emailed Marlaina Koller, Respondent's Vice President, to schedule a meeting.  (Id. at 6.)  On April 16, 2014, the Union sent a letter to Ms. Koller formally requesting that Respondent recognize and collectively bargain with the Union as the representative of drivers and matrons who service the Dutchess County routes.  (Id.)  Then on May 14, 2014, a Union representative visited Respondent's Wappingers Falls facility to speak with Ms. Koller, but she was not at the facility.  (Pet. Ex. F at 2-3, ECF No. 1.)  To date, Respondent has not recognized or bargained with the Union.

---

[3] Respondent serviced a route for students of the New York School for the Deaf from the Wappingers Falls facility in addition to the Dutchess County routes.  (Pet. at 6-7, ECF No. 1.)
[4] Estimates in the record range from 58 to 60.
[5] The estimates in the record of this proportion range from 60% to 90%, but, as explained below, all that is relevant is that the proportion is greater than 50%.

The Union filed charges with the NLRB on May 15 and August 1, 2014 for unfair labor practices.  (Pet. at 2, ECF No. 1.)  A hearing on the consolidated charges is scheduled for December 15, 2014 before an NLRB Administrative Law Judge.  (Letter from Ira D. Wincott to Judge Román at 1, Oct. 30, 2014, ECF No. 10.)  The Regional Director now petitions under § 10(j) of the Act for temporary injunctive relief, pending the Board's final decision, directing Respondent to recognize and bargain with the Union, to post the Court's order at Respondent's Wappingers Falls facility, and to file an affidavit setting forth the manner of Respondent's compliance with the Court's order.  (*See* Pet. at 6-8, ECF No. 1.)

## STANDARD OF REVIEW

In assessing a § 10(j) petition, a district court applies a two-prong test:  (1) the court must find "reasonable cause" to believe that unfair labor practices have been committed, and (2) the court must find that the requested relief is "just and proper."  *Hoffman ex rel. N.L.R.B. v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 364-65 (2d Cir. 2001).

The reasonable cause standard is considerably deferential to the Regional Director. "With respect to issues of fact, the Regional Director should be given the benefit of the doubt . . . and on questions of law, the Board's view should be sustained unless the court is convinced that it is wrong."  *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051 (2d Cir. 1980) (internal quotation omitted); *see also Kaynard v. Mego Corp.*, 633 F.2d 1026, 1031 (2d Cir. 1980) (holding that the court should sustain the Regional Director's factual assertions if they are "within the range of rationality").  A petitioner must, notwithstanding, come forward with "evidence sufficient to spell out a likelihood of [a] violation."  *Mattina v. Chinatown Carting Corp.*, 290 F. Supp. 2d 386, 391 (S.D.N.Y. 2003) (quoting *Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers' Union*, 494 F.2d 1230, 1234 (2d Cir. 1974)).

**DISCUSSION**

Section 8(a)(5) of the Act makes it unlawful for an employer to "refuse to bargain collectively with the representatives of [its] employees."  29 U.S.C. § 158(a)(5).  Where a union's representation was established under a previous employer, the duty to bargain extends to a "legal successor."  *In re Dattco, Inc.*, 338 NLRB 49, 49 (2002) (citing *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 36-41 (1987)).  Because Respondent does not dispute that it has failed to bargain with the Union, the reasonable cause inquiry turns on whether Respondent is a legal successor.  Respondent is a legal successor only if (1) there is "substantial continuity" of operations and (2) a majority of "an appropriate bargaining unit" are the predecessor's employees at a time when the alleged successor has reached a "substantial and representative complement."  *Fall River Dyeing*, 482 U.S. at 36-41.

Petitioner contends that the Wappingers Falls facility is an appropriate bargaining unit. Respondent contends that Wappingers Falls must be considered together with the Yonkers facility.  A single-facility bargaining unit is presumptively appropriate unless it has been "so effectively merged into a more comprehensive unit, or is so functionally integrated, that it has lost its separate identity."  *Dattco*, 338 NLRB at 50.  In assessing whether the presumption has been overcome, a court considers such factors as "central control over daily operations and labor relations, including the extent of local autonomy; degree of employee interchange; similarity of skills, functions, and working conditions; and bargaining history, if any."  *Id.*; *accord Dean Transp., Inc.*, 350 NLRB 48, 58 (2007), *enf'd*, 551 F.3d 1055 (D.C. Cir. 2009).  As explained below, (i) on this record and in light of *Dattco*, the Court is constrained to find that there is no reasonable cause to believe that the Wappingers Falls facility is an appropriate unit, and (ii) as a result, Respondent has not violated the Act.

4

Under facts similar to the instant case, the Board in *Dattco* concluded that a single facility was not an appropriate bargaining unit.  338 NLRB at 50.  In that case, the Board noted that bus drivers across facilities possessed the same skills and certifications and performed the same job duties under the same working conditions.  *Id.* at 50-51.  A substantial number of drivers were shuttled from their base facility to other facilities, daily, as the need arose.  *Id.* at 50.  Finally, control was largely centralized at the respondent's headquarters.  This included hiring, firing, formulating policies and procedures, setting wages and benefits, and carrying out labor relations, payroll, accounting, and records functions.  *Id.* at 50-51.  Trainings and seminars were conducted at headquarters, and vehicle repair and maintenance for all nine facilities was centralized at two of those facilities.  *Id.*  Negotiating contracts with clients, formulating routes, and assigning drivers to those routes were all carried out centrally.  *Id.*  The most senior employee at the facility at issue was a dispatcher who performed some supervision but possessed limited authority.  The dispatcher would, for example, explain local rules to drivers, direct drivers where to park busses, issue employees verbal warnings for lateness and tardiness, and communicate with headquarters concerning the resources needed for each shift.  *Id.* at 50.

Here, drivers and matrons in Wappingers Falls perform the same job duties as those in Yonkers and possess roughly identical skills, certifications, and training.  Both facilities provide preschool and special education transportation services.

There is also some interchange of employees between facilities.  Throughout the spring and summer of 2014, Respondent shuttled as many as ten employees from the Yonkers facility to Wappingers Falls for the day, at least a few times each week.[6]  (Pet'r's Mem. at 13, ECF No. 3.) Additionally, seven nonmanagement employees from Yonkers have permanently transferred to

---

[6] While this degree of interchange may not be continuing through the start of the 2014-2015 school term, it still bears on the degree to which the facilities are integrated.

the Wappingers Falls facility.  (Pet. Ex. C at 5, ECF No. 1.)  Respondent anticipates being able to

shuttle Wappingers Falls employees to Yonkers as the need arises.  (*Id.*)  While the degree of

interchange in *Dattco* was perhaps greater, the interchange here is not so limited as to alter the

conclusion that the single-facility presumption has been rebutted.  *See, e.g.*, *Waste Mgmt. of

Wash., Inc.*, 331 NLRB 309, 309, 311 (2000) (noting that four or five instances of employee

interchange per week was "minimal" but did not alter the conclusion that the single-facility

presumption had been rebutted).

   Also as in *Dattco*, supervision and control over Respondent's daily operations is largely

centralized, with limited autonomy at the facility level.  Respondent's management team—

President Judith Koller, Vice President Marlaina Koller, and Operations Manager Elida

Wulczyn—has authority over both facilities.[7]  (Pet. Ex. C at 4, ECF No. 1.)  Petitioner does not

dispute that decisions regarding policies, procedures, hiring, firing, discipline, wages and

benefits are made centrally.  Accounting and payroll for both facilities are housed in Yonkers.

(*Id.* at 5.)  Vehicle repair and maintenance for both facilities is performed in Yonkers (although

Respondent intends to open a repair shop in Dutchess County).  (*Id.* at 4.)  Wappingers Falls has

two local dispatchers who perform, in some sense, a supervisory role; however, as in *Dattco*, the

local dispatchers' authority is limited.  (Pet. Exs. D-E, ECF No. 1.)  Dispatchers arrange for

coverage in the event of a bus accident, report late or tardy students to schools and parents as

necessary, and deal with other issues as they arise.  (*Id.*)  But if they feel they cannot address an

issue, the dispatchers elevate the issue to Ms. Wulczyn, who has an office in Yonkers.  (*Id.*; Pet.

Ex. C at 4, ECF No. 1.)  The dispatchers lack the authority to make hiring, firing, or disciplinary

decisions; rather, the evidence Petitioner has presented indicates that the dispatchers convey

---

[7] Even if Judith Koller spends most or all of her time in Wappingers Falls, Petitioner does not dispute that she is the President of the company and wields authority over both facilities.

decisions that are made by the Kollers and Ms. Wulczyn. (Pet. Exs. D-E, ECF No. 1.) For example, the dispatchers convey route assignments to drivers and matrons, but those assignments are determined centrally. (*Id.*) Accordingly, the degree of integration across facilities and limited local autonomy at Respondent is akin to that in *Dattco*. The dispatchers' somewhat supervisory role does not alter this conclusion. *See Dattco* 338 NLRB at 50 ("The managers or dispatchers at the receiving terminals supervise the drivers sent to them.").

Finally, while there is no history of collective bargaining at Respondent, the newly hired drivers and matrons were part of a multi-facility bargaining unit while at Durham.[8] (*See* Pet. at 3-4, ECF No. 1.) This further weighs against the single-facility presumption (and is a factor that was not present in *Dattco*).

This case is distinguishable from *Dean Transportation*, in which the respondent failed to rebut the single-facility presumption. 350 NLRB at 48. In *Dean Transportation*, there was significantly more local autonomy at each facility, "virtually no" employee interchange, and less uniformity of job skills and working conditions across facilities. The facility at issue had its own mechanics, its own route planners, and two on-site supervisors and an assistant supervisor who oversaw dispatchers, drivers, and route planners. *Id.* at 51-52. These supervisors did not exercise authority over any other facilities. *Id.* Additionally, there had been only two instances of temporary employee interchange among drivers (at a facility of 137 drivers). *Id.* at 57. Moreover, the facility at issue was the only one that employed a substantial number of general education drivers in addition to special education drivers. *Id.* at 59. Finally, the respondent even

---

[8] Petitioner characterizes Durham's bargaining history as "single location bargaining." While a district court deciding a § 10(j) petition should credit the petitioner's factual inferences that are "within the range of rationality," *Kaynard*, 633 F.2d at 1031, this one is not. Petitioner's own statement of the bargaining unit at Dunham describes one unit with *two* locations—one in Poughkeepsie, New York and one in Red Hook, New York. (Pet. at 3-4, ECF No. 1 ("All full-time and regular part-time drivers and monitors employed by the Employer at its 10-14 Tucker Drive, Poughkeepsie, New York and Middle Road, Red Hook, New York locations . . . .").)

treated the facility as a separate unit for labor-related purposes including seniority, job bidding, and the grievance process. *Id.* at 55, 59. As a result, *Dean Transportation* is inapposite.

As of April 22, 2014,[9] out of more than 260 drivers and matrons across both facilities, roughly 60 were former Durham employees. Because Wappingers Falls must be considered together with the Yonkers facility, former Durham employees do not constitute a majority of the bargaining unit, defeating legal successorship. As a result, there is no reasonable cause to believe that Respondent had a duty to bargain with the Union, and its refusal to do so did not violate the Act.

## CONCLUSION

For the foregoing reasons, the Court DENIES the Regional Director's petition for temporary injunctive relief under § 10(j) of the Act. The Court respectfully directs the Clerk to close this case.

Dated:   December 1ST, 2014          SO ORDERED:
         White Plains, New York

                                     NELSON S. ROMÁN
                                     United States District Judge

---

[9] There is no dispute between the parties over the date on which the composition of the workforce should be evaluated.

8